UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLEG TARASUK, | No. 2:19-cv-0573 AC |
| Petitioner, | |
| v. | ORDER AND FINDINGS AND RECOMMENDATIONS |
| ROBERT NEUSCHMID, Warden, | |
| Respondent. | |

Petitioner is a California state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on the original petition, ECF No. 1, which challenges petitioner's 2015 conviction for second degree murder, driving under the influence, and related offenses. Respondent has answered, ECF No. 9, and petitioner has filed a traverse, ECF No. 14.

## BACKGROUND

I.    Proceedings in the Trial Court

   A.  Preliminary Proceedings

Petitioner was charged in Placer County with multiple felonies arising from a pedestrian fatality that followed petitioner's flight from police in his vehicle. The case went to trial.

////

////

1

B. <u>The Evidence Presented at Trial</u>

The jury heard evidence of the following facts.[1] In August 2012, at about 8:00 p.m., A.S. was driving home from the gym. After making a left turn at an intersection a short distance from his neighborhood, he noticed a truck making a right turn into the intersection from the opposite direction. The truck, driven by petitioner, made the turn at a high rate of speed, causing the tires to "screech" against the roadway. Petitioner accelerated in the lane adjacent to A.S., pulling up next to him while "revving" the engine, and then braked to back off. He did this several times. When A.S. made a left turn into his neighborhood, petitioner followed. He continued to accelerate and decelerate, but this time immediately behind A.S.'s car. A.S. made another turn down the street where he lived and pulled over. Petitioner also made the turn, but positioned his truck in front of A.S.'s car and flashed his high beams two or three times. A.S. started to get out of his car to confront petitioner, but petitioner drove away. A.S. then called 911 and followed petitioner a short distance, where he made a U-turn and parked at a roadside recycling center. A.S. parked his car at a safe distance and reported petitioner's conduct to the 911 operator, who immediately dispatched officers to the location. A.S. left the scene when he saw officers arrive, but provided his phone number to the 911 operator.

Officer Ron Goodpaster was the first to arrive. He parked his marked patrol car about 30 or 40 feet behind petitioner's truck and approached the driver's side of the truck wearing a standard police uniform. The sun had recently set, but it was still fairly light out. Petitioner, who was speaking on his cell phone in Russian, told Goodpaster in "very broken English" that he was having an argument with his wife and handed the officer the phone. Goodpaster handed the phone back and told him to hang up. Petitioner complied. The officer noticed that petitioner's eyes were "bloodshot and watery" and his face was "flushed," indicating possible intoxication. The truck was still running, so Goodpaster told him to turn it off. Petitioner complied with this direction as well. The officer then performed a horizontal gaze nystagmus test while petitioner was still in the driver's seat, which also indicated possible intoxication.

---

[1] This summary is adapted from the opinion of the California Court of Appeal, Lodged Doc. 16 (ECF No. 8-16), at 3-8. The undersigned finds it to be accurate.

Officer Gary Smith arrived on the scene and parked his patrol car between Goodpaster's patrol car and petitioner's truck. Smith, who was also wearing a standard police uniform, joined Goodpaster at the driver's side window and also noticed that petitioner's eyes were "watery and bloodshot." Smith then returned to his patrol car and contacted A.S on the phone. After speaking to A.S. for three or four minutes, Smith returned to petitioner's truck. In the meantime, Officer Curtis Watkins also arrived on the scene. He too arrived in a marked patrol car and was wearing a standard police uniform. When Watkins got to the driver's side window, Goodpaster was trying to communicate with petitioner but "it was difficult . . . due to the language barrier." Petitioner did understand he was being questioned about his alcohol consumption, however, and admitted to having a "little bit of beer." Because none of the officers spoke Russian, Goodpaster radioed for a Russian-speaking officer to assist in the investigation.

Watkins was briefly alone next to petitioner's window while Goodpaster and Smith discussed the latter's conversation with A.S. behind the truck. Goodpaster then returned to his patrol car to wait for the Russian-speaking officer. Watkins attempted to engage petitioner in small talk while everyone waited for that officer to arrive, and he noticed the smell of alcohol on petitioner's breath. Petitioner then received a call on his cell phone and said it was his wife. Watkins told him not to answer, but petitioner did so anyway. After a brief conversation in Russian, petitioner hung up the phone and started the truck. Watkins yelled: "Shut off the car." Rather than comply, petitioner "began revving the engine" and tried multiple times to shift the truck into drive. He was unable to do so, apparently because his foot was on the gas pedal rather than the brake pedal. While petitioner was trying to put the truck in gear, Watkins yelled multiple times for him to turn off the engine. Watkins then reached inside the window just as the gear shift lever engaged in drive and quickly returned the truck to park.

As Watkins and petitioner struggled over control of the gear shift, Smith ran back to the truck yelling: "No. No. Don't drive away." Smith opened the driver's door and both he and Watkins tried to pull petitioner out while keeping the truck in park. Petitioner's physical resistance, aided by the fact he was wearing his seat belt, prevented the officers from removing him from the truck. As Watkins testified, "he was trying to push us out of the truck and trying to

pry our hands from the gearshift lever." As Watkins pulled out his service knife to try to cut the seat belt to allow them to pull petitioner out of the truck, Smith deployed his taser in an attempt to incapacitate petitioner. The taser misfired. At that point, petitioner was able to shift the truck into drive and the officers stepped back to avoid being pulled underneath the truck as it drove away.

Meanwhile, Goodpaster was standing next to his patrol car when he heard petitioner's truck start. Seeing Smith and Watkins struggling with petitioner, Goodpaster got into his patrol car to try to block petitioner's truck from driving away. As the truck began moving forward, Goodpaster activated his overhead emergency lights and tried to intercept petitioner. Unable to get in front of petitioner, Goodpaster drove his patrol car into the side of the truck in an attempt to push it onto an adjacent dirt road rather than allowing petitioner to get back onto the roadway. Both vehicles crashed through a chain link fence separating the roadway from the dirt road, but the truck remained oriented towards the roadway and was gaining traction, so Goodpaster struck the vehicle a second time in an attempt to spin it out and stall the engine. This maneuver succeeded in spinning the truck 90 degrees, but did not stall the engine, allowing petitioner to drive onto the roadway heading southbound. When it became clear Goodpaster would not be successful in stopping the truck from getting onto the roadway, Smith and Watkins returned to their patrol cars, activated their emergency lights, and followed in pursuit. Goodpaster followed immediately behind them. Petitioner did not have his headlights on despite the fact it was now dark enough that headlights were necessary to safely navigate the road.

Less than a mile away, G. and his wife, J., were standing on a pedestrian median on the west side of the roadway, waiting to cross Main Street to the south. A traffic signal pole separated them. G. was on the side of the pole that was closer to the roadway where petitioner was driving. From the north, the roadway curved slightly before intersecting with Main. As petitioner's truck approached the intersection at around 50 miles per hour, without its headlights on, petitioner was unable to negotiate the curve while remaining in the roadway. The truck drove over the curb separating the roadway from the pedestrian median, continued across the median, and struck G. from behind as it also sideswiped the traffic signal pole. As J. described in her

testimony at trial, she saw "flashing police lights" in her peripheral vision. The lights were coming from behind her, so she turned her torso and head to the left to look in that direction. As she did so, she saw G. was also turning his torso and head to the left to look behind him. At that moment, J. heard the sound of "screeching tires" as petitioner's truck jumped the curb and struck her husband from behind, throwing him onto the hood of the truck as it continued onto Main Street and struck another vehicle.

J.'s account of petitioner's truck hitting G. from behind while G. turned his torso to the left was corroborated by the forensic pathologist's testimony detailing G.'s injuries. The doctor explained that G. was struck from behind with enough force to cause a "whiplash- type" dislocation of the joint between his skull and cervical spine, severing his brain stem from the spinal cord. Death came instantly. Several fractures to G.'s posterior left rib cage were consistent with him turning to the left when he was impacted. Other injuries, including pelvis fractures and avulsive skin abrasions to G.'s groin area, were consistent with having been struck from behind. The impact with the truck also fractured G.'s thoracic spine, severing his aorta, a fatal injury.

After hitting G. from behind on the pedestrian median, petitioner's truck struck an SUV as the latter vehicle was turning left onto Main Street. This broadside collision pushed the SUV across Main and into another vehicle, while petitioner's truck spun nearly 180 degrees and ended up behind and pointed away from the SUV. While J. did not see what happened to her husband following the collision of petitioner's truck and the SUV, other evidence established G.'s legs were briefly caught between the vehicles before his body was thrown free of the collision and landed on the sidewalk on the other side of Main.

The pursuing officers arrived at the crash site within seconds and took petitioner into custody. He was transported to the hospital, where further DUI investigation was conducted, including two preliminary alcohol screening (PAS) tests. The first, administered at 9:03 p.m., registered a BAC of 0.191 percent. The second, administered two minutes later, registered a BAC of 0.196 percent. Petitioner's blood was drawn at 9:17 p.m. Subsequent testing revealed a BAC of 0.23 percent.

Various witnesses to the collision also testified, none of whom testified to seeing a pedestrian attempting to cross Main Street and being struck by the SUV before that vehicle was hit by petitioner's truck (the defense theory). The only witness who saw G. as he was hit was his wife, who testified unequivocally that her husband was hit from behind by petitioner's truck while he was still on the pedestrian median. A number of these other witnesses also corroborated her testimony that petitioner's truck jumped the curb and drove across the median where G. was standing prior to the collision. Analysis of the crash site, including tire marks on the curb and tire depressions across the median, also indicated that petitioner's truck had jumped the curb and entered the median.

### C. Outcome

The jury found petitioner guilty of second degree murder (Cal. Penal Code § 187(a); driving with a blood alcohol content of 0.08 percent or higher causing injury (Cal. Veh. Code § 23153(b); willful evasion of a peace officer (Cal. Veh. Code § 2800.2(a); and resisting an executive officer (Cal. Penal Code § 69). In a bifurcated proceeding, the trial court found a prior strike under Cal. Penal Code § 667(a)(1). Petitioner was sentenced to 30 years to life in prison, plus 13 years and 8 months.

## II.   Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on March 14, 2018. Lodged Doc. 16 (ECF No. 8-16). The California Supreme Court denied review on June 13, 2018. Lodged Doc. 17 (ECF No. 8-17) at 1. Petitioner did not file any applications for collateral relief in the state courts.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182.

Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

DISCUSSION

I. Claim One: Insufficient Evidence to Support Murder Conviction

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that his second degree murder conviction violated due process because the evidence at trial was insufficient to support the verdict.  The evidence presented at trial has been summarized in pertinent part above.

B. The Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." Id. at 326.  "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).

C. The State Court's Ruling

This claim, like all of petitioner's claims, was raised on direct appeal.  Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in

8

this court. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012). The appellate court ruled as follows:

> Defendant does not dispute the sufficiency of the evidence to support any element of his murder conviction other than causation. He argues evidence of causation is lacking because "[o]ther than [J.], no other witness to the accident saw [his] truck strike a pedestrian" and "ample evidence" shows G. was actually struck and killed by the SUV turning onto Main Street "less than a second" before that vehicle was hit by defendant's truck. This is absurd.
>
> " 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)
>
> Here, we need look no further than J.'s testimony to reject defendant's contention. She testified to seeing defendant's truck strike her husband from behind as they turned their torsos and heads to the left to see what was going on behind him. There is nothing physically impossible or inherently improbable about this account. This testimony is corroborated by testimony from both the forensic pathologist and the prosecution's expert in accident reconstruction. The fact no other witness saw defendant's truck strike G. is as irrelevant to our assessment of the sufficiency of the evidence as it is unsurprising. The intersection was dark and, as defendant points out, the scene was "chaotic." This does not mean that J., standing next to G. when he was hit, could not see who hit him. Nor are we persuaded by defendant's assertions J.'s testimony was "biased" and the jury "apparently paid little heed" to the trial court's instruction (CALCRIM No. 200) directing them to "not let 'bias, sympathy, prejudice, or public opinion influence' their decision." First, it is not for this court to determine whether J. harbored a bias against defendant. The jury was appropriately instructed to consider whether her testimony was "influenced by a factor such as bias or prejudice" in deciding whether or not to believe her testimony. (CALCRIM No. 226.) We presume the jury did so. (*People v. Yeoman* (2003) 31 Cal.4th 93, 138-139.) Second, as to whether the jury allowed its own bias or sympathy to influence its decision, the same presumption applies. The jury was instructed not to do so and we presume it understood and followed the instruction. (*Ibid*.)
>
> Defendant's assertion that it was the turning SUV that initially struck

9

> G. as he attempted to cross Main Street "less than a second" before defendant's truck struck the SUV is contradicted by J.'s testimony and the testimony of both the forensic pathologist and the accident reconstruction expert. The first piece of evidence defendant relies upon in advancing this argument does not support an inference the initial impact was caused by the SUV. He cites testimony from C.W., the driver of the vehicle immediately behind the SUV, specifically that this witness did not see defendant's truck hit G. But this does not supply proof it was the SUV that did so. C.W. did not see that occur either. He did, however, see defendant's truck cross the pedestrian median at a high rate of speed and nearly miss a pedestrian. Presumably, that pedestrian was J. Thus, despite not seeing the impact with G., this witness's account corroborates J.'s testimony. Defendant also cites various pieces of forensic evidence he claims support his version of G.'s death. We decline to recount this evidence here. Instead, we simply note it is the jury that is tasked with resolving conflicts in the evidence, not this court. (*See People v. Young, supra*, 34 Cal.4th at p. 1181.)
>
> The evidence was more than sufficient to establish causation. It was overwhelming.

Lodged Doc. 16 (ECF No. 8-16) at 8-10.

### D. Objective Reasonableness Under § 2254(d)

The state court expressly applied the Jackson v. Virginia standard that is required by clearly established federal law, and it did so reasonably. Petitioner's argument, which is articulated in his traverse (ECF No. 14), amounts to an argument appropriately made to a jury about reasonable doubt, evidence that could be interpreted to support the defense theory, and the competing inferences that could be drawn from other items of evidence. All of this is irrelevant under Jackson and progeny, however. J.'s eyewitness testimony, even without corroboration by forensic expert testimony or additional eyewitness testimony, readily supported a rational finding that petitioner's truck had struck and killed G. That a competing theory of the evidence can also be articulated does not make the jury's conclusion irrational. See Cavazos, 565 U.S. at 2 (standard is whether any rational trier of fact could have agreed with the jury, not whether an alternative theory was also supported by evidence and permissible inferences).[2]

---

[2] In Cavazos, the Supreme Court reversed a grant of habeas relief on insufficient evidence grounds in a "shaken baby" case, where the prosecution's case-in-chief was entirely circumstantial and the defense case was significantly stronger than that presented here. In this case, where the record contains eyewitness testimony and physical evidence to support the finding that petitioner committed the fatal act, the case for deference to the verdict under Jackson is even stronger than it was in Cavazos.

10

In his traverse, petitioner contends that relief is available under 28 U.S.C. § 2254(d)(2) because the state court's decision was based on an unreasonable determination of facts. ECF No. 14 at 23. How so? Petitioner argues, "The state appellate court limited its review to finding evidence which might [have] supported the prosecution's case and corroborated the testimony of [the victim's] widow. While doing so, the reviewing court ignored the material, credible evidence supporting Mr. Tasaruk's defense." Id. There are two problems with this argument, both fundamental. First, the appellate court made no independent findings of disputed fact that could be subject to § 2254(d)(2) review, it merely applied the Jackson standard of review to the trial record.[3] Second, Jackson affirmatively *required* the reviewing court to view the evidence in the light most favorable to the prosecution, and to defer to the jury's judgment that all inferences from conflicting evidence were resolvable in the prosecution's favor. Jackson, 443 U.S. at 319, 326. Accordingly, the state court reasonably applied Jackson. Particularly in light of the "double dose of deference" to the verdict that is required under Jackson and the AEDPA, Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011), federal habeas relief is unavailable.

II.  Claim Two: Insufficient Evidence to Support DUI Conviction

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that his DUI conviction violated due process because the evidence at trial was insufficient to support the verdict. The evidence presented at trial has been summarized above; further details regarding the blood alcohol evidence is set forth in the portion of the appellate opinion quoted below. The undersigned has confirmed he accuracy of that summary.

B. The Clearly Established Federal Law

This claim is also governed by Jackson v. Virginia, supra, and progeny.

C. The State Court's Ruling

The California Court of Appeal ruled as follows:

---

[3] Section 2254(d)(2) applies to findings of fact that are made by a state court rather than by a jury. See, e.g., Miller-El v. Dretke, 545 U.S. 231 (2005) (finding unreasonable fact-finding by state court at Batson hearing regarding racial discrimination in jury selection); Brumfield v. Cain, 576 U.S. 305 (2015) (finding unreasonable fact-finding by state court at Atkins hearing regarding defendant's eligibility for death penalty in light of intellectual disability).

11

Defendant argues his conviction for driving with a BAC of 0.08 percent or more must be reversed because the criminalist who testified regarding defendant's blood alcohol tests "could not say with any degree of certainty" that his BAC was 0.08 percent or higher at the time of the collision. This argument is belied by the record.

The criminalist, Hillary Bantrup, testified an "average-sized male" can typically eliminate about 0.02 percent BAC per hour from his bloodstream. Based on a hypothetical scenario involving a male subject of defendant's height and weight with a BAC of 0.23 percent at 9:17 p.m., Bantrup was asked to estimate that individual's BAC at 8:20 p.m., i.e., the time of the collision. Assuming this hypothetical individual had fully absorbed into his bloodstream all of the alcohol he consumed earlier in the night, and the individual eliminated alcohol from his bloodstream at the average rate, Bantrup testified his BAC at 8:20 p.m. would have been between 0.24 and 0.25 percent. Asked to further assume this hypothetical individual "had not [drunk] any alcohol from 8:05 p.m. to the time of the crash [at] 8:20 p.m.," Bantrup was asked for her opinion as to whether or not that individual's BAC was 0.08 percent or higher at 8:20 p.m. She responded: "Given that information, given that at least 15 minutes had passed from the time of consumption, I would again estimate that approximately 80 percent of whatever the peak alcohol concentration was absorbed into the bloodstream by 8:20 p.m. Given that we have a [0.23], I would safely be able to assume that this individual was over a [0.08] at the time of driving or at the time of [the] crash." This evidence, coupled with the fact that each aspect of the hypothetical was supported by substantial evidence, is more than sufficient to prove beyond a reasonable doubt that defendant drove with a BAC of 0.08 percent or more.

Nevertheless, relying on certain answers taken out of context, defendant claims Bantrup was uncertain about whether or not his BAC was 0.08 percent or more at the time of the crash. When Bantrup said, "I can't say with any certainty what exactly the level was at 8:20 p.m.," she had not yet been asked to assume the hypothetical individual had not drunk any alcohol between 8:05 p.m., i.e., the time he was detained by officers at the recycling center, and 8:20 p.m. Once she had that piece of the hypothetical in place, she "safely" concluded the BAC was over 0.08 percent at 8:20 p.m. Then, during cross-examination, referring to the PAS breath tests administered at 9:03 p.m. and 9:05 p.m., indicating a BAC of 0.191 percent and 0.196 percent, respectively, defendant's counsel asked: "And if you had *just those two values*, and if both instruments, your chromatograph and the PAS, were accurate, I believe it was your testimony that was -- that you could not determine back at 8:20 whether this person had a [0.08] or better. Was that your testimony?" (Italics added.) Bantrup answered: "Yes. So if the individual was still, in fact, rising in [BAC], I could not give a specific alcohol concentration at 8:20 p.m." (Italics added.) However, a reasonable inference from all of the evidence is that defendant was not drinking while stopped at the recycling center, during the span of roughly a minute that it took him to get to the crash site, or after being taken into custody following the crash. And assuming this to be the case, Bantrup was able to safely conclude defendant's BAC was over 0.08

>
> percent at 8:20 p.m. Bantrup also explained the PAS tests may have been inaccurate, but the blood test was not.
>
> The evidence was more than sufficient to establish defendant drove with a BAC of 0.08 percent or more.

Lodged Doc. 16 (ECF No. 8-16) at 10-12.

### D. Objective Reasonableness Under § 2254(d)

Petitioner has identified nothing objectively unreasonable about the state court's application of Jackson to this claim. The undersigned finds no error, let alone an objectively unreasonable application of clearly established federal law. There was evidence presented to the jury that petitioner had alcohol in his system at the time of the vehicular fatality and collision, and that at the time of those incidents his blood alcohol content exceeded the legal limit. For Jackson purposes and under the AEDPA, it is irrelevant that the blood alcohol expert opinion was contested. Because the jury had a rational basis for its conclusions, the state court's rejection of this claim was reasonable under Jackson and relief is unavailable under the AEDPA. See Boyer, 659 F.3d at 964.

## III. Claim Three: Insufficient Evidence to Support Conviction for Resisting an Officer

### A. Petitioner's Allegations and Pertinent State Court Record

Petitioner contends his conviction for resisting an executive officer violated due process because the evidence was insufficient to support the verdict.

### B. The Clearly Established Federal Law

This claim is also governed by Jackson v. Virginia, supra, and progeny.

### C. The State Court's Ruling

The appellate court ruled as follows:

> Defendant further argues his conviction for resisting an executive officer must be reversed for insufficient evidence. He is mistaken.
>
> Section 69 may be violated either by "attempting with threats or violence to deter an officer from performing his or her duties" or by "resisting an officer by force or violence" while that officer was performing his or her duties. (*People v. Campbell* (2015) 233 Cal.App.4th 148, 160.) The second type of violation, of which defendant was convicted, requires proof that: (1) he unlawfully resisted an executive officer; (2) the resistance was accomplished by means of force or violence; and (3) he knew the officer was

13

> performing his or her duties. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 984-985.)
>
> Defendant does not claim the evidence was insufficient to establish he unlawfully resisted Officers Goodpaster, Smith, and Watkins at the recycling center, or that he did so by means of force or violence. Their testimony in that regard is overwhelming. Instead, defendant claims he did not know these officers were performing their lawful duties at the time. He bases this argument on testimony from the officers that their interaction with defendant was "cordial and polite" while everyone waited for the Russian-speaking officer to arrive. Because the initial interaction at the recycling center was so "benign," and no one "informed [defendant] that he was to be detained on suspicion that he was driving while under the influence," defendant argues he reasonably believed he was free to leave and "[i]t was only after he started exercising his apparent right to depart that the officers escalated the situation into a free-for-all."
>
> We need not determine at which moment defendant was officially detained on suspicion of DUI. All that is required to sustain this conviction against defendant's challenge is sufficient substantial evidence he knew the officers were performing their lawful duties. "Knowledge, like intent, is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494-495.) Here, three officers wearing standard police uniforms arrived in three separate marked patrol cars, asked defendant questions regarding his alcohol consumption, and one of them performed a field sobriety test on defendant as he sat in the driver's seat. That defendant understood the officers was evidenced by the fact he hung up the phone and turned off the truck when Goodpaster told him to do so. Defendant also acknowledged he had drunk a "little bit of beer" when asked about his alcohol consumption. This evidence supports a reasonable inference defendant knew the officers were performing their lawful duties, i.e., investigating him on suspicion of DUI, when he unlawfully and forcibly resisted them by starting the truck, ignoring their commands to turn it off, and physically wresting control of the gear shift lever from both Watkins and Smith as he engaged the vehicle in drive and drove away.
>
> The evidence was more than sufficient to establish defendant resisted an executive officer in the performance of his or her duties.

Lodged Doc. 16 (ECF No. 8-16) at 12-13.

### D. Objective Unreasonableness Under § 2254(d)

Petitioner has identified nothing objectively unreasonable about the state court's application of Jackson to this claim. The undersigned finds no error, let alone an objectively unreasonable application of clearly established federal law. There was ample evidence before the jury that the officers were performing their law enforcement duties when they questioned

14

petitioner and tried to prevent him from leaving the scene of initial contact, and that this was perfectly obvious to petitioner. That any jury conclusions regarding petitioner's subjective state of mind were necessarily based on inferences from the circumstances does not undermine the verdict. To the contrary, because those inferences did not lack a rational basis the court of appeal was bound by clearly established federal law to uphold them. Jackson, 443 U.S. at 326. Accordingly, the state court's rejection of this claim was reasonable under Jackson and relief is unavailable under the AEDPA. See Boyer, 659 F.3d at 964.

   IV.   Claim Four: Improper Admission of "Character Evidence"

      A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that "the trial court erred by allowing testimony of inadmissible character evidence." ECF No. 1 at 11. Petitioner contends that the testimony of A.S. about petitioner's driving prior to petitioner's encounter with police—driving that petitioner characterizes as "unrelated to the driving resulting in the collision and death of the pedestrian"— constituted impermissible and prejudicial testimony of aggressiveness. Id.

      B. The Clearly Established Federal Law

The admission of evidence is governed by state law, and habeas relief does not lie for errors of state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991). The erroneous admission of evidence violates due process, and thus supports federal habeas relief, only when it results in the denial of a fundamentally fair trial. Id. at 72. The Supreme Court has rejected the argument that due process necessarily requires the exclusion of prejudicial or unreliable evidence. See Spencer v. Texas, 385 U.S. 554, 563-564 (1967); Perry v. New Hampshire, 565 U.S. 228, 245 (2012).

      C. The State Court's Ruling

The appellate court ruled as follows:

> Defendant claims the trial court prejudicially abused its discretion by allowing A.S. to testify regarding the observations that caused him to report defendant to law enforcement authorities. Specifically, defendant argues A.S.'s testimony regarding his "reckless" and "aggressive" driving amounted to inadmissible character evidence "offered only to show that [he] was a person with 'criminal traits' and pre-disposed to engage in reckless anti-social behavior." We disagree.

15

> With certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) One such exception is found in subdivision (b) of this section, which provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act." (*Id*., subd. (b).) We review the trial court's admission of evidence for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25.)
>
> Here, A.S.'s testimony regarding defendant's driving was not evidence of another act suggesting a negative character trait that was relevant to prove the specific charged conduct by way of propensity, i.e., the character trait that caused defendant to commit that other act made it more likely he also committed the charged act. Instead, A.S.'s testimony provided direct evidence of defendant's driving behavior immediately before he was contacted by police. This evidence was relevant to prove the charged act itself, that defendant was driving while intoxicated on the night he killed G. by running him down.
>
> The trial court did not abuse its discretion in admitting this evidence over defendant's objection.

Lodged Doc. 16 (ECF No. 8-16) at 14-15.

### D. Objective Unreasonableness Under § 2254(d)

The appellate court resolved petitioner's claim exclusively as a matter of admissibility under California law. The state court's resolution of that issue is binding on this court. See Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

Assuming without deciding that a due process claim based on this alleged evidentiary error was exhausted and that the California Court of Appeals rejected it *sub silencio*, AEDPA bars relief. No decision of the U.S. Supreme Court has ever found that due process was violated by the admission of character evidence in violation of state evidentiary rules (let alone when permitted by state evidentiary rules) or by jury consideration of propensity evidence. Where the Supreme Court has not expressly announced the specific constitutional rule on which a petitioner relies for relief, there can be no unreasonable application of clearly established federal law. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam). For this reason, the Ninth Circuit has repeatedly rejected § 2254 claims based on the admission of prejudicial evidence

including character and propensity evidence. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006), cert. denied, 549 U.S. 1287 (2007).

Even without reference to AEDPA's limitations on relief, petitioner cannot prevail on a due process claim because the record does not support a finding of fundamental unfairness. Even without the A.S. testimony there was ample evidence of petitioner's reckless driving and aggressiveness on the night in question, and nothing about the testimony could plausibly be considered prejudicial when the evidence is considered as a whole. See Estelle, 502 U.S. at 72.

V.   Claim Five: Sentencing Error

   A.   Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that the trial court erred by sentencing Mr. Tarasuk separately on the murder and DUI counts rather than applying Cal. Penal Code § 654. ECF No. 1 at 12.

   B.   The Clearly Established Federal Law

Sentencing is generally governed by state law, and errors related to the application of state law do not support federal habeas relief. Lewis, 497 U.S. at 780. A state law sentencing error provides a cognizable basis for habeas relief only where the error was "so arbitrary or capricious as to constitute an independent due process violation." Richmond v. Lewis, 506 U.S. 40, 50 (1992).

   C.   The State Court's Ruling

The appellate court ruled as follows:

> Finally, we also reject defendant's contention the trial court violated section 654 by imposing and executing sentence on both the murder conviction and the DUI causing injury conviction.
>
> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although these distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one of the separate offenses arising from the single act or omission—the offense carrying the

> highest punishment. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1345.)
>
> Defendant argues he engaged in a single criminal act, i.e., hitting G. with his truck while he was intoxicated. However, "section 654 does not apply to crimes of violence against multiple victims" because " '[a] defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person.' [Citation.]" (*People v. Correa* (2012) 54 Cal.4th 331, 341.)
>
> In *People v. Murray* (1990) 225 Cal.App.3d 734, the Court of Appeal employed this exception to section 654's prohibition against multiple punishment where a single act of intoxicated and reckless driving caused a collision killing four people and injuring two others. Specifically, the Court of Appeal held the trial court acted within its discretion in imposing and executing sentence on four counts of murder and two counts of DUI causing injury, explaining: "Multiple punishment is proper when a single act of violence, including drunk driving, injures or kills multiple victims." (*Id.* at p. 749.) Here, as in Murray, defendant was convicted of the murder of G. and DUI causing injury to the driver of the SUV he collided with after killing G. Thus, the multiple victim exception applies and defendant's contention fails.

Lodged Doc. 16 (ECF No. 8-16) at 15-16.

### D. Objective Unreasonableness Under § 2254(d)

The appellate court resolved this issue exclusively under California law. Its resolution of the state law question is binding on this court. See Lewis, 497 U.S. at 780 (1990); Bradshaw, 546 U.S. at 76. Even if the sentence had violated California law, relief would not be available here. See Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994) ("a state court's misapplication of its own sentencing laws does not justify federal habeas relief.").

To the extent if any that petitioner attempted to raise a due process claim regarding sentencing, AEDPA bars relief because no U.S. Supreme Court precedent holds that due process is violated by the imposition of separate sentences for offenses against distinct victims. See Wright, 552 U.S at 125-126; see also, e.g., John-Charles v. California, 646 F.3d 1243, 1253 (9th Cir.) (denying relief because no clearly established Supreme Court precedent prohibits the challenged sentencing practice), cert. denied, 565 U.S. 1097 (2011).

////

////

## CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS HEREBY ORDERED that a United States District Judge be randomly assigned to this case.

It is HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 3, 2023

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE